## LOUISVILLE & N. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit.   March 3, 1911.)

### No. 1,999.

1. RAILROADS (§ 254*)—SAFETY APPLIANCE ACT—ACTION FOR VIOLATION—PLEADING.

· The declaration in an action by the United States against a railroad company to recover penalties for violation of Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), considered, and *held* sufficient.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 254.*]

2. COMMERCE (§ 27*)—SAFETY APPLIANCE ACT—CONSTRUCTION.

The provision of Act March 2, 1903, c. 976, § 1, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1143), amendatory of the safety appliance acts of March 2, 1893 (chapter 196, § 6, 27 Stat. 532), and April 1, 1896 (29 Stat. 85 [U. S. Comp. St. 1901, p. 3175]), extending the provisions of such acts relating to train brakes, automatic couplers, grabirons, and the height of drawbars to "all trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce," is intended as a regulation of such railroads only when engaged in interstate commerce, and does not apply to a road when engaged in the domestic commerce of a state.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 27.*]

3. COMMERCE (§ 27*)—SAFETY APPLIANCE ACT—CONSTRUCTION.

The provision of Act March 2, 1903, c. 976, § 1, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1143), amendatory of the safety appliance acts of March 2, 1893 (chapter 196, § 6, 27 Stat. 532), and April 1, 1896 (chapter 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3175]), that the requirements of such acts relating to train brakes, automatic couplers, etc., shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used in interstate commerce, "and all other locomotives, tenders, cars and similar vehicles used in connection therewith," does not require that the connection between a car not equipped as therein required and one used in interstate commerce shall be immediate to bring it within the statute, but it is sufficient if they are in the same train.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 27.*]

4. EVIDENCE (§ 215*)—COMPETENCY—RECORD AS ADMISSION.

In an action by the United States against a railroad company to recover penalties for violation of Safety Appliance Act March 2, 1893, c. 196, § 6, 27 Stat. 532, as amended by Act April 1, 1896, c. 87, 29 Stat. 85 (U. S. Comp. St. 1901, p. 3175), and Act March 2, 1903, c. 976, § 1, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1143), a record kept by a station agent of defendant in his office in the regular course of his duty showing the contents of a car loaded at his station and its origin and destination was admissible on behalf of the government to prove that the car was being used in interstate commerce, as an admission of fact by defendant.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 754–759; Dec. Dig. § 215.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the District Court of the United States for the Western District of Tennessee.

Action by the United States against the Louisville & Nashville Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

John B. Keeble, Ed. T. Seay, and C. G. Bond, for plaintiff in error.
George Randolph, U. S. Atty., Wade H. Ellis, Asst. Atty. Gen., Philip J. Doherty and Walter N. Brown, Special Asst. U. S. Attys., and R. F. Walter, for the United States.

Before SEVERENS, WARRINGTON and KNAPPEN, Circuit Judges.

SEVERENS, Circuit Judge. This action was prosecuted by the United States in the District Court for the recovery of penalties alleged to have been incurred by the defendant by reason of its failure to comply with the provisions of the act of Congress approved March 2, 1893, commonly called the "Safety Appliance Act," and the amendments thereto passed April 1, 1896, and March 2, 1903, respectively, and more particularly the provisions of the last-mentioned amendment.

The declaration contains four counts, each of which alleged in equivalent phraseology the violation of the law in respect to the use in interstate commerce of a particularly numbered car on which the couplings or handholds did not comply with the requirements of the act. The first count will serve as a sample of them, and, omitting preliminaries, is here reproduced as follows:

"For a first cause of action, plaintiff alleges that said defendant is a common carrier engaged in interstate commerce by railroad among the several states and territories of the United States, particularly the state of Tennessee.

"Plaintiff further alleges that in violation of the act of Congress known as the safety appliance act, approved March 2, 1893 (contained in 27 Statutes at Large, p. 531 [U. S. Comp. St. 1901, p. 3174]), as amended by an act approved April 1, 1896 (contained in 29 Statutes at Large, p. 85), and as amended by an act approved March 2, 1903 (contained in 32 Statutes at Large, p. 943 [U. S. Comp. St. Supp. 1909, p. 1143]), said defendant on or about August 10, 1908, hauled on its line of railroad one car, to wit, its own No. 40146, said car being one regularly used in the movement of interstate traffic, and at the time of said violation hauled in train containing interstate traffic one other car in said tra'n, to wit, its own No. 92920, containing interstate traffic, to wit, merchandise, consigned to a point within the state of Alabama.

"Plaintiff further alleges that on or about said date defendant hauled said car, its own No. 40146, as aforesaid, over its line of railroad from Paris, in the state of Tennessee in a northerly direction, within the jurisdiction of this court, when the coupling and uncoupling apparatus on the "A" end of said car was out of repair and inoperative, the chain connecting the lock block or lock pin to the uncoupling lever being disconnected on said end of said car, thus necessitating a man or men going between the ends of the cars to couple or uncouple them, and when said car was not equipped with couplers coupling automatically by impact, and which could be uncoupled without the necessity of a man or men going between the ends of the cars, as required by section 1 of the act of March 2, 1903.

"Plaintiff further alleges that by reason of the violation of said act of Congress, as amended, defendant is liable to plaintiff in the sum of $100."

. The defendant interposed a demurrer to the declaration, the grounds of which were, in substance, that in neither of the counts was it charged that at the time when the car was hauled with defective equipments, whether in respect of its couplings or handholds, it was being employed in interstate commerce, and, further, that the act of March 2, 1903, on which the action was based, is unconstitutional and void, in that "it does not confine the violation to car or cars actually engaged in or used in interstate commerce, but creates a liability though the car, or cars, complained of were not used in interstate commerce." The demurrer was overruled and the defendant pleaded not guilty.

[1] The first of these grounds taken by the demurrer raises a question of pleading. It is whether the paragraph commencing, "Plaintiff further alleges that on or about said date defendant hauled said car," etc., is sufficiently connected with the preceding paragraph in time, place, and circumstances to show that it refers to the same occurrence so as to be a more specific allegation of what had in part already been stated. It must be admitted to be loose and rather inconsequential pleading. But a majority of the court is inclined to hold that the pleader intended to signify that the later averments were of the identical matter stated in the former and that this was made sufficiently apparent. In this respect the counts were all alike.

Having reference to the proofs for a more specific exhibition of the charge, the case was this: The defendant railroad company operates a railway as a common carrier in several contiguous states, in interstate as well as intrastate commerce. At the time when the alleged offenses were committed, it was moving a freight train on its road from Paris, in the state of Tennessee, to another place in the same state. The organization of the train was, so far as it is necessary to describe it, this: Near to the forward end of it was a car loaded with freight, some of which was consigned to a point or points in Alabama. It is not charged that this car was not equipped with the proper couplings and handholds. Toward the rear end of the train were the four freight cars in question, not alleged to be carrying interstate freight, which were not equipped with the required couplings as to two of the cars, nor with proper handholds as to the other two. Between these and the car carrying interstate freight were other cars not alleged to be carrying interstate freight, and not alleged to be without the required couplings or handholds.

The case was tried before a jury. Evidence was produced tending to prove the foregoing facts. Some of this evidence was received under objection, a matter which we pass by for the present. The court instructed the jury, among other things, as follows:

"As to whether or not these cars were being used in interstate commerce at the time it is alleged these defective cars were being so hauled, I charge you that if there was in that train one car containing freight that was being hauled from a point in Tennessee to a point in another state that one car contained interstate commerce, and, under this statute, that one car inoculated the whole train, and the train was being operated in interstate commerce, although the other cars in the train were cars that were being used for camp purposes, and being hauled only between points in Tennessee."

The railway company complains of this instruction, and contends among other things that if the car carrying interstate freight was

equipped with the proper appliances, and the cars, or engine and car, in immediate connection therewith, were also properly equipped, the law was not violated. This point we also pass by for the moment.

[2] The second ground is of much more serious import. By the first section of the act of March 2, 1903, it is declared that:

"The provisions and requirements hereof and of said acts [meaning the acts of March 2, 1893, and April 1, 1896] relating to train brakes, automatic couplers, grabirons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce."

And the question is whether this language is intended to be directed to all railroads, which are sometimes engaged in interstate commerce, and to be applicable to them at all times whether they may be then engaged in interstate business or in the domestic commerce of the state, or is it directed to the regulation of such railroads when they are engaged in interstate commerce? The language is broad enough to amount to a regulation of such railroads while engaged in the domestic commerce of a state, and, if it were not restricted by any limitation, might be held to extend to every kind of commerce whether interstate or domestic. These were the conditions which were presented to the Supreme Court in the so-called Employer's Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297. And, if these were all the conditions of the case now before us, we should be required by the authority of that case to sustain the demurrer. But in that case there had been no previous legislation upon the subject, and therefore nothing which could be referred to as explanatory of the meaning of the act. There was nothing which the court could lay hold of to restrict the generality of its terms. This being so, there was no alternative but to construe the act upon the plain meaning of the language employed. But the act of 1903 was an amendment of previous legislation upon the same subject—that is to say, of the acts of 1893 and 1896—and that legislation sufficiently indicated that it was directed to railroad companies for their regulation while they were employed in interstate commerce. At page 503 of the Employer's Liability Cases, 207 U. S. at page 147 of 28 Sup. Ct. (52 L. Ed. 297), the now Chief Justice White, after referring to another argument made by counsel for the plaintiffs in error, observed:

"And the same observation is appropriate to the reference made to the text of the safety appliance act of March 2, 1893 (27 Stat. 531), which, it is insisted, furnishes a guide which, if followed, would enable us to disregard the text of the act. We say this because the face of that act clearly refutes the argument based upon it. It is true that the act like the one we are considering is addressed to every common carrier engaged in interstate commerce, but this direction is followed by provisions expressly limiting the scope and effect of the act to interstate commerce."

And the amendment would be read as if it were consolidated with the earlier acts; for it is a rule of construction that "an amendment of a statute by a subsequent act operates precisely as if the subject-matter of the amendment had been incorporated in the prior act*at the time of its adoption, so far as regards any action had after the amendment is made." Black on the Interpretation of Laws, 357.

These considerations lead us to the conclusion that the amendment of 1903 was intended to be a regulation of railroads while they are engaged in interstate commerce, and that the language means the same thing as if the word "when" were interposed before the word "engaged." And, indeed, this is not a forced construction, but is one of the natural constructions which the words actually used would bear; for "engaged" might with equal propriety refer to a continuous period, or to a definite time. And this fact would found the duty of adopting the latter definition. And, so construed, the statute is relieved of the objection that Congress has no power to regulate the domestic commerce of a state.

[3] Then, further, it is argued that the "connection" of the car carrying interstate freight which the act intends is an immediate connection with cars not properly equipped, and that there was neither allegation nor proof that these conditions existed. Because the act visits a penal consequence upon its violation, and of other considerations which we need not dwell upon, there was some ground for argument that the law should have such restricted operation. But the trend of decision in the Circuit Courts and the Circuit Courts of Appeals has been the other way, and is to the effect that the connection of the cars in a train is not required to be immediate, and we are not so far convinced that those decisions are wrong as to justify us in holding to the contrary.

· [4] It remains to consider certain objections to the admission of evidence. Notice was given to the attorney for the railroad company to produce upon the trial the original waybills which accompanied these cars. The attorney denied all knowledge of them, and they were not produced. A witness named Johnson was called by the government, and testified that he was an agent of the railroad company at Paris, and that it was his duty in August, 1908, to oversee the loading and unloading of freight, locking up cars and billing them out; that he kept a record of the movement of cars at that station and of the origin and destination of freight passing through it; that he kept a record, made under his supervision, of the contents of car 92920 on August 10, 1908; and that that record was preserved in his office. He produced an impression copy of an entry of the waybill book, a part of such records. It was offered in evidence, and admitted against the defendant's objection that it was "not the best evidence of what the car contained." The objection was overruled, and the defendant excepted. The impression copies contained entries of freight in car 92920 consigned to various points in Alabama, Illinois, and Tennessee. Proof of what the car contained might have been made by the original waybills. But they were not the only competent evidence of the facts. They were not contractual instruments between these parties, and were not the necessary proof of the facts which they might have a tendency to prove. An admission of the facts made by the defendant would be competent evidence to prove them, independently of the waybills. The record kept and preserved by the agent at Paris employed for the purpose by his company were competent, though doubtless not incontestible, evidence to prove an admission of the fact by the railroad company. For this purpose, it would not be necessary to establish

all the necessary conditions of proof which would be required if the railroad company were offering these records for some self-serving purpose of its own. These records were kept for the very purpose of giving necessary information on which the company itself would rely. It is proper to add that the objection was not aimed to the circumstance that the papers offered were not the records of the company's office, and were only impressions of them, but was directed to the point that they were secondary evidence of the waybills. This is confirmed by the argument here. They state their point thus:

"The question comes up, then, as to whether these records were admissible in evidence or whether they are secondary and hearsay and inadmissible."

And the argument made is to demonstrate that the original entries made were not made in such conditions as would justify their admissibility in evidence.

Another witness named Cash who was a car inspector employed by the Interstate Commerce Commission for the purpose of detecting violations by railroads of the safety appliance acts testified that he saw the original waybills in the caboose of the train containing the cars in question, and that he made a memorandum of them showing the origin of the shipments, destinations, and the names of the consignors and of the consignees. This was offered in evidence. The record shows that this memorandum was read to the court and jury without objection. Subsequently, and at the close of his evidence, counsel for the railway company moved to exclude the testimony of the witness, "because," as they said, "it is not shown as a matter of fact whether this was properly done, or whether it is the original." Assuming, without deciding, that the objection was seasonably made, we understand that the last objection must refer to the question whether the memorandum produced was his original memorandum. But the evidence was such as might satisfy the court and jury that it was the original memorandum which he made at the time. And, as to the question whether "it was properly done," it might fairly be inferred that, when he said he made a memorandum of the bills, he meant that he made it correctly.

The judgment must be affirmed, with costs.